**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1.  ANN ARTHUR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIV-14- 464-M |
| | ) | |
| 1.  INTEGRIS HEALTH, INC., | ) | |
| | ) | ATTORNEY LIEN CLAIMED |
| Defendant. | ) | JURY TRIAL DEMANDED |

**COMPLAINT**

**COMES NOW** the Plaintiff, Ann Arthur, and for her Complaint in the above-entitled action, alleges and states as follows:

**PARTIES**

1. Plaintiff, Ann Arthur, is an adult female resident of Canadian County, Oklahoma.

2. Defendant Integris Health, Inc., is an entity doing business in Canadian County, Oklahoma.

**JURISDICTION AND VENUE**

3. This is a cause of action arising out of Plaintiff's former employment with Defendant based on claims of (1) disability discrimination and retaliation in violation of the ADA and ADAAA, and (2) retaliation for use of leave under the Family Medical Leave Act ("FMLA").

4. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331.

5. All of the actions complained of herein occurred in Canadian County, Oklahoma. Defendant is doing business in such county and may be served in said county. Canadian County is located in the Western District of Oklahoma. Wherefore, venue is proper in this Court under 28 U.S.C. § 1391(b).

6. Plaintiff has exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 15, 2013. Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated April 15, 2014 (received by Plaintiff by mail thereafter), and has timely filed this action within ninety (90) days of receipt of the notice of right to sue.

## STATEMENT OF FACTS

7. Plaintiff Ann Arthur, whose date of birth is January 1977, began her lengthy period of employment with Defendant at its facility in Yukon, Oklahoma (called the Integris Canadian Valley Hospital) in or around February 2006 as a Physical Therapist Assistant ("PTA"). Throughout the majority of Arthur's employment, she was consistently recognized as a satisfactory or better employee, receiving annual pay increases and positive performance evaluations.

8. During her employment, Arthur was supervised by Acute and Outpatient Director Sherri Boos (who worked at the same facility). Boos reported to Scott Anthony, the

Administrative Director of Outpatient Rehabilitation for Jim Thorpe Rehabilitation. Anthony reported to Keith Wilton, Vice President of Jim Thorpe Rehabilitation.  Wilton, in turn, reported to James Moore, President of Integris Southwest Medical Center.

9. In or around February 2013, Arthur was notified by her doctor that the results of her annual gynecological exam were abnormal and that she needed to undergo a biopsy. Therefore, in or around mid-March 2013, she underwent a biopsy procedure, which confirmed Arthur had cervical cancer at the age of 36.

10. On or about March 29, 2013, Arthur underwent a cold-knife biopsy to determine the cancer's margins and further diagnose her.  She applied for and used FMLA leave for two (2) weeks for this medical procedure, returning to work in or around mid-April, 2013.

11. Shortly after the cold-knife biopsy, Arthur was told by her doctors that she had carcinoma in situ with clear margins, but that she needed a complete hysterectomy as soon as possible.

12. Arthur has been a liver transplant patient since the age of 21, making the necessity of the hysterectomy far more urgent due to her compromised immune system. The hysterectomy would require Arthur to be off work for six (6) weeks.

13. In April 2013, when Arthur told Boos of her diagnosis and need for time off for surgery, Boos, who was visibly frustrated, responded, "can't you wait until December 2013 for your surgery" (i.e., eight months) because allegedly the "schedule was not

conducive" to Arthur being off work for a medically-necessary hysterectomy due to her cancer diagnosis.

14.     What actually made the schedule "not conducive" to her surgery was the fact that Boos was scheduled for a two (2) week summer vacation during June/July 2013.

15.     In or around the end of April 2013, Arthur again asked Boos about her need to schedule her surgery. Boos had no interest in assisting Arthur and was non-cooperative. In fact, Boos attempted to avoid the issue.  Boos told Arthur that she could not discuss the surgery until after Boos was back from being out the last week of April 2013.

16.     Arthur continued to advise Boos of her need for surgery, finally prompting Boos to state that she could have the surgery, but it needed to be scheduled on a Tuesday. Boos provided no explanation as to why Arthur's surgery needed to be scheduled on a Tuesday.

17.     Boos then began nitpicking Arthur.  For instance, she told Arthur that a conservative pair of capri-length jeans that ended slightly above her ankle that Arthur wore to work were allegedly inappropriate in the workplace, despite the fact that they complied with the dress code policy and she had worn such jeans to work numerous times before without issue.

18.     Arthur scheduled her surgery for June 7, 2013, and gave notification to Boos in or around the end of April 2013.

19.     On or about May 10, 2013, Boos held a staff meeting for all employees with

Arthur present. In the meeting, Boos stated that she and Jennifer McCray would not be able to take their scheduled vacations because "Ann has to have surgery." Boos was very displeased in her tone.

20. Boos also told administrative assistant, Katherine Jones, that Jones would not be able to take two (2) days off in July 2013 because of Arthur's surgery. Significantly, Jones and Arthur worked in different areas and held completely different job duties. Such malicious conduct was an effort by Boos to make Arthur feel bad about her need for time off for surgery and to turn her co-workers against her just after being diagnosed with cancer.

21. After a staff training in or around mid-May 2013, Arthur was summoned into Boos' office where Arthur was interrogated. Boos questioned Arthur in an aggressive and offensive manner if "something was wrong," despite knowing of Arthur's medical issues. Boos stated that Arthur appeared disinterested in the training session. However, Arthur was able to recite the information discussed at the training, down to the color of marker used by the person making the presentation.

22. Boos then called a second meeting with Arthur and Madison (last name unknown), who conducted the presentation, to further discuss Arthur's alleged disinterest in the presentation. Arthur was again asked if something was wrong and accused of not paying attention during the training. Arthur then told Boos that she felt that Boos was mad at her because she had cancer and needed to have surgery. Boos responded, "Ann, you don't have *cancer*." In fact, Boos made this comment more than once.

23. Regardless of the invalidity of this terribly offensive comment, the reality was that Arthur did have cancer. In fact, when the hysterectomy was performed, she still had cancer on her cervix.

24. Arthur was off work on FMLA leave from on or about June 6, 2013 through Friday, July 19, 2013. She returned to work on or about Monday, July 22, 2013, with a 50-pound lifting (*inter alia*) restriction. Despite her restrictions, Arthur was able to perform the essential functions of her job with or without a reasonable accommodation.

25. Upon her return to work, Boos asked Arthur when she was going to have a follow-up appointment with her doctor. Arthur advised her that her follow-up appointment was scheduled in February 2014.

26. After returning to work, Arthur was further discriminated and retaliated against by Boos. Boos told Arthur that she was no longer allowed to do her documenting downstairs, despite allowing Ms. McCray, another PTA, to do so and despite having allowed Arthur to do so before she was diagnosed with cervical cancer. Boos also constantly questioned Arthur as to what she was doing, despite Boos being able to clearly see what Arthur was working on. Boos also nitpicked and found fault with practically everything Arthur did. Arthur had not been treated in this manner before her cancer diagnosis and requests for time off for medical care.

27. Moreover, in August 2013, after Arthur had been back to work for a few weeks, she was written up by Boos allegedly for not following the newly implemented

6

patient no-call/no-show procedure. However, such reason was pretext as it was untrue. Arthur had, in fact, complied with the new policy. Particularly, the patient in question was not a "no call/no show" in that he had actually called the office twice the morning of his scheduled appointment, spoke with a receptionist, and confirmed his following scheduled appointment. Thereafter, although inconsistent with policy, Boos had asked Arthur to call the patient. Arthur asked Boos for permission to call the patient at a particular time later in the day which Boos agreed to. And, Arthur called the patient as agreed. When confronted with this information contrary to the allegations in the discipline, Boos then changed her reason for the write-up, claiming that Arthur allegedly had a bad attitude about the new policy. Boos also made a reference to not being able to trust Arthur.

28. None of these issues had ever been raised with Arthur before her cancer diagnosis and the inconvenience to Boos with Arthur's time off for surgery and treatment.

29. The discrimination, harassment and retaliation continued. On or about Thursday, September 26, 2013, Arthur was called into Boos' office. Boos accused her of being deceptive because no notes allegedly existed in the file for September 18, 2013, a day that Arthur allegedly told Boos she was "doing notes." However, on the day in question, Arthur had been completely booked with patients. The day Boos was referring to was actually on or about September 16, 2013 (not September 18) and all of Arthur's notes were accounted for on that day. Boos then told Arthur that she was going to take one of two actions, claiming both were "very serious," and let Arthur know her decision the following

day.

30.     On or about Friday, September 27, 2013, Arthur went to work, but Boos would not allow her to complete any inpatient treatment, part of her usual tasks.  At noon, Arthur was called into a conference room, where the Director of Jim Thorpe Rehabilitation, Scott Anthony, Boos, and security personnel were present.  Arthur was told she was being terminated allegedly for "decreased performance since being back from her surgery."  However, her performance had not "decreased."

31.     Arthur was then told to pack up her office with Boos, Anthony and security hovering over her and while her co-workers looked on.  Arthur was humiliated by such conduct.  She was then escorted by Boos, Anthony and security off the premises.

32.     Arthur has been designated as not eligible for rehire.

33.     Arthur is a qualified individual with a disability within the meaning of the ADA and ADAAA in that she was disabled, has a record of disability, and/or was perceived as disabled.  Her disabilities substantially limit and/or limited her in one or more major life activities, including but not limited to lifting, pulling and pushing. Her disabilities impact one or more of her internal bodily processes, including but not limited to normal reproductive and liver function, *inter alia*.  However, at all times relevant hereto, she was able to perform the essential functions of her job with or without reasonable accommodations.

34.     As a direct and proximate result of Defendant's actions, Arthur has suffered the injuries described hereafter.

## COUNT I - ADA AND ADAAA

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

35. The matters alleged above constitute discrimination, harassment, and retaliation based on a disability, a record of a disability and/or perceived disabilities in violation of the ADA and ADAAA.

36. More specifically, Plaintiff was a qualified individual with a disability in that she suffers from physical impairments (i.e., cancer and transplanted liver) which substantially limit her ability to perform one or more major life activities as set forth above. Further, Plaintiff's disabilities impact one or more of her internal bodily processes as shown herein.

37. Despite said impairments, Plaintiff could perform the essential functions of her job with or without reasonable accommodations at all relevant times hereto.

38. As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

39. Because the actions of Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT II: FMLA

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

40. The matters alleged above constitute retaliation for Plaintiff's use and/or

attempted use of medical leave for self care in violation of the Family Medical Leave Act.

41. Plaintiff was entitled to medical leave because she required time off to care for herself due to a serious health condition (as set forth above) and worked for Defendant (i.e., entities with more than 50 employees within a 75 mile radius of Plaintiff's worksite), for more than one (1) year and for more than 1,250 hours within the one year prior to her need for leave.

42. Defendant retaliated against Plaintiff for her use of time off.

43. As set forth herein, Defendant's actions were in willful violation of the law. Defendant was aware of FMLA and the requirements contained therein, but willfully violated Plaintiff's FMLA rights.

44. As a direct and proximate result of Defendant's actions, Plaintiff has suffered injuries and is entitled to recovery of all damages, including, but not limited to, lost wages (past and future), liquidated damages (based on the willfulness of Defendant's violation of the FMLA), attorney fees and costs.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendant and assess actual, compensatory, punitive damages, and liquidated damages, together with pre- and post-judgment interest, costs, attorney's fees and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 7th DAY OF MAY, 2014.**

                                          s/Jana B. Leonard
                                          JANA B. LEONARD, OBA# 17844
                                          EMILY VAN VOLKINBURG, OBA #31744
                                          LEONARD & ASSOCIATES, P.L.L.C.
                                          8265 S. WALKER
                                          OKLAHOMA CITY, OK 73139
                                          (405) 239-3800     (telephone)
                                          (405) 239-3801     (facsimile)
                                          leonardjb@leonardlaw.net
                                          emilyv@leonardlaw.net

                                          JURY TRIAL DEMANDED
                                          ATTORNEY LIEN CLAIMED